Springer, C. J.,
dissenting:
I dissent because I believe that Schoels did not get a fair trial and because I disapprove of what I see as being unfair and improper prosecutorial tactics employed by the State’s attorneys in this case. I would reverse the judgment of conviction and the sentence of life without the possibility of parole.
The main point that I raise was not raised by Schoels in his appellate briefing. I raise it on my own. As a consequence, the State’s attorneys have not had an opportunity to present counter arguments to the position that I forward in this dissenting opinion. I am, therefore, cautious not to be critical or lay blame on prosecutors who appear to be employing these objectionable practices. I am satisfied, nonetheless, that it is crucial to the administration of the criminal justice system in this state that the subject at hand be brought to the immediate attention of the bench and the bar.
This is the objectionable prosecutorial practice that I see being employed in this case and in other murder cases on a fairly regular basis: In murder cases that do not call for the death penalty under the standards of this court and the United States Supreme Court, prosecutors have, nonetheless, adopted the common practice of seeking the death penalty, not because they believe the case is truly a capital case but because they believe that seeking the death penalty will give them a tactical advantage. This practice gives prosecutors an advantage in the plea bargaining process and, if the accused goes to trial, results in an increased likelihood that the jury will return, by way of compromise, the next most severe verdict, life without the possibility of parole. A prosecutor who would knowingly overcharge in this manner is not only violating his oath by prosecuting in bad faith, such a prosecutor is risking the undeserved death of the accused if the jury were to “buy” the prosecutor’s affected death penalty argument.[1]
*993 In order to make a non-capital case look like a capital case, prosecutors often try to make a procrustean fit of “aggravating circumstances” into a fact pattern that cannot suitably conform to any notion of that term as it is defined in our law. A good example of this agonizing process is found in the present case, in which the prosecutor tried to fit a simple, close-range shooting, involving two mutual combatants, into the statutory aggravating circumstance, “knowingly created a risk of death to more than one person.” Schoels was involved in a life-or-death fight after his assailant “grabb[ed] Schoels around the legs,” after which Schoels fired, point blank, into the body of his assailant. There is nothing at all in this case to suggest that in doing this he was “knowingly” or otherwise risking the life of other persons. (Unless of course, we were to say that he should have been able to know that a bullet might enter his adversary’s body, exit the body and then find its way to some bystander).[2] The jury found *994 that this was not a death penalty case, and it should have been readily apparent to the prosecution that this was not a death penalty case.
Prosecutors have certain duties that go beyond those normally imposed on private counsel. ‘ ‘An accused, whether guilty or innocent, is entitled to a fair trial, and it is the duty of the court and prosecutor to see that he gets it.” Garner v. State, 78 Nev. 366, 373, 374 P.2d 525, 529 (1962) (citation omitted) (emphasis added). An elaboration of the prosecutor’s special duty was furnished by the United States Supreme Court in Berger v. United States, 295 U.S. 78 (1934). This reasoning was relied upon in Garner, and warrants our consideration in the present case:
The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor. . . . But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
Berger, 295 U.S. at 88 (emphasis added).
I see Schoels’ conviction and sentence as being “wrongful.” I would reverse the conviction because Schoels did not get a fair trial. Schoels was put in unwarranted jeopardy of death by being overcharged. He was charged with capital murder, it appears to me, solely to give the prosecution an unfair advantage and to increase the chances of the jury’s bringing in a life without possibility of parole verdict. Now, I suppose it can be argued that sending this teen-aged boy to prison for life, for some fifty or sixty years, doomed to die in prison and leave in an oblong box, *995 is in the best interests of society, but it is difficult to convince me that this is the case. The wrongful conviction should be reversed. This case should be retried, and retried as a non-capital case.
There are other reasons why I dissent. I cannot agree with the majority’s approval of the blood-on-your-hands argument used by the State. As put in the majority opinion, the “prosecution argued to the jury . . . that it was necessary to put Schoels to death in order to prevent him from killing others in the future, thereby saving innocent victims from the murderous hand of William Schoels.” There are two reasons why such an argument is impermissible. The first is that there is absolutely no evidence in this case that Schoels was going to go out and kill “innocent victims.” The type of fight that ended in the death of one of the combatants here simply does not lend support to the prosecutor’s claim that the jury must end Schoels’ life in order to “sav[e] innocent victims” from death. The second reason is that it is unfairly prejudicial in any case for a prosecutor, the representative of State authority, to try to convince lay jurors that the only way to spare the lives of innocent victims in the future is to return a death verdict. See Howard v. State, 106 Nev. 713, 719, 800 P.2d 175, 178 (1990) (“improper to ask the jury to vote in favor of future victims and against a defendant”); Castillo v. State, 114 Nev. 271, 280, 956 P.2d 103, 109 (1998) (“whether it will be an execution sentence for the killer ... or for a future victim of this defendant”); Sherman v. State, 114 Nev. 998, 965 P.2d 903 (1998) (“Do we execute a person who has killed ... or do we risk the execution of some very innocent people?”).
Admitting that the prosecutor’s argument was “improper” and that the district court’s permitting this argument to be presented was error, the majority, nevertheless, says that the error was “harmless.” What troubles me about the majority’s view is its saying that it would “reverse the conviction or death penalty where the decision between life or.death is-a close one.” There is no question but that Schoels shot his assailant during mutual combat.[3] Under these circumstances, the question of “life or death” is not a “close one”; it is nonexistent. This is not a death case; but if it were, it certainly must be said that “the decision between life or death [of this black teen-age youth] is a close one”; and, accordingly, the court should reverse the death penalty. In one’s vain search for a justifiable explanation for the death sentence prosecution and the resultant life without the possibility of parole sentence, this youth’s race looms large among the possibilities.
*996 Returning to the issue of arbitrary prosecutorial decisions as to who does and who does not have to face the death penalty in homicide cases, Justice Douglas put the problem in proper perspective when he wrote: “Under these laws no standards govern the selection of the penalty. People live or die, dependent on the whim of one man . . . Furman v. Georgia, 408 U.S. 238, 253 (1972) (Douglas, J., concurring). As mentioned, the Supreme Court of Nevada Task Force Implementation Committee for the Elimination of Racial, Economic, and Gender Bias in the Justice System made formal findings and recommended the adoption of prosecutorial standards for prosecutors in death cases. I believe that until such standards are adopted in Nevada, we are going to continue to see arbitrary decision-making by prosecutors based on prosecutors’ personal, moral or ideological backgrounds and upon a variety of other factors, including the level of public outcry, race and unacceptable political considerations. Unfettered prosecutor-ial discretion and unstructured plea bargaining practices naturally tend to result in arbitrary and discriminatory sentences being sought and imposed by reason of an ever-broadening class of death-eligible defendants conjured by zealous prosecutors, unrestrained by any objective standards for selecting those cases in which the death penalty is going to be sought.
This court should attend to the recommendations of its own Task Force, a body which made official findings that African Americans and other minorities are very much over-represented on death row. Minority offenders constitute half of those who are given the death sentence in murder cases.[4] In seeking the cause of this imbalance, the Task Force focused on the breadth of prose-cutorial discretion. The Task Force was unable to discern just what factors went into prosecutorial choices relative to the death penalty and stated that it “could do no more than speculate or generalize based on anecdotal information about what the District Attorneys in Nevada do when having to decide whether a homicide should be treated as a capital crime.” Supreme Court of Nevada Task Force Implementation Committee for the Elimination *997 of Racial, Economic, and Gender Bias in the Justice System, Final Report: Findings and Recommendations, ADKT 160, at 70 (June 18, 1998). This being the case, the Task Force recommended legislation revising death penalty statutes in a way that would “mandate uniformity within the state of the decisions and methods for seeking the death penalty for those eligible pursuant to NRS 200.033.” Id. In my view, this court should take the lead in setting such standards of uniformity.
One way that some uniformity could be achieved would be, according to the Task Force, to require prosecutors to provide “a detailed description of the procedures followed in reaching a decision as to whether to prosecute a homicide as a capital case.” Id. The Task Force concluded that it was necessary to determine “[w]hat factors are taken into account in addition to the statutory aggravating circumstances listed in the NRS, in deciding to prosecute a homicide that is deemed to have one or more aggravating circumstances.” Id. The Task Force recognized that at present there is no “uniformity” and no standardized “procedures followed in reaching a decision” as to whether to seek the death penalty and wisely recommended that steps be taken to correct this defect in the death sentencing process.
Although the Supreme Court of the United States has not decided a case which condemns unrestricted breadth of prosecu-torial discretion, I certainly think that it is time, under our State Constitution, that both this court and our legislature addressed this serious problem. Justices Stevens, Blackmun and Marshall agreed with Justice Brennan’s dissent, in which he recognized the problem in McClesky v. Kemp, 481 U.S. 279 (1987), and expressed his concern over the “myriad of opportunities for racial considerations” that are inherent in the exercise of such broad prosecutorial discretion, and decried the fact that “[n]o guidelines govern prosecutorial decisions to seek the death penalty.” Id. at 333 (Brennan, J. dissenting). The Task Force recognized a very serious defect in our capital sentencing jurisprudence; and I feel strongly that this court should recognize that, under the Equal Protection Clause and the Due Process Clause, some standards for prosecutorial discretion must be put in place throughout the State. Lack of state-wide standards and guidance for individual prosecutors with respect to the death decision virtually assures that the death penalty will be sought arbitrarily and, occasionally, imposed arbitrarily. We are very much in need of a systematic and reviewable narrowing procedure for determining death eligibility during the early critical stage of prosecution.
This conviction should be reversed and remanded for trial before a jury that is not death-qualified, a jury that does not have to hear a morally and legally groundless argument that Schoels *998 should be lethally injected and a jury that is not told that it must bring in a death verdict or have blood on its hands.
Schoels’ unfair trial is in large part attributable to Nevada’s faulty death-sentencing scheme, which permits and encourages arbitrary and baseless capital prosecutions. I urge this court to adopt standards of uniformity for prosecution of capital cases in a manner that will be “fair and consistent” and will not subject prosecutors to accusations, founded or unfounded, that they are basing their life or death choices on racial or other arbitrary and impermissible grounds.

 One of the considerations that moved me to raise the issues of overcharging and unrestricted prosecutorial discretion on my own was the report to the court of its Supreme Court of Nevada Task Force Implementation Committee *993 for the Elimination of Racial, Economic, and Gender Bias in the Justice System. One of the major concerns of the Task Force was the untrammeled power of prosecutors to decide who should live and who should die. The Task Force resolved that measures should be taken to “develop uniform procedures and criteria for determining which murder cases should be capital cases.” Implementation Plan at F3, ADKT 160 (August 4, 1998). Without such standards being in place, prosecutors are necessarily subject to being suspected of letting racial or other biases enter into the life-death decision making process. The Task Force saw the development of standards, “procedures” and “criteria” for making this vital decision as a necessity in order to make “sure that the [death sentence process] is fair and consistent.” Id.
Prosecutors’ death penalty decisions cannot, the Task Force reasoned, be fair and consistent unless there are some standards upon which to judge the fairness and consistency of these decisions. In the case now before us, we have a black youth who killed another black youth in mutual combat — hardly, as the jury in this case recognized, a death case, maybe not even a first-degree murder case. Any prosecutor’s decision to seek the death penalty in a case such as this one is going to be justifiably subject to inferences that race was a factor in the decision-making process. This case shows rather vividly that the Task Force was correct in recommending to us that procedures and criteria must be put in place to limit the presently unlimited discretion of prosecutors in making these critical decisions.
Obviously, the recommendations of the Task Force are not binding on the court nor do they provide a basis for reversing this or other convictions and sentences based on apparent abuses of prosecutorial discretion. I cite the Task Force report to show the perceived need to avoid appearances of racial bias in the death sentencing process. If the Task Force recommendations had been implemented, it would have been more difficult for me to make a case for reversal on the basis of the misuse of prosecutorial discretion.

 This “aggravator” is designed to apply in cases in which some “hazardous” device (perhaps a bomb or incendiary “device”) is employed to carry out a murder. This aggravator could be properly applied in some firearms cases, for example, where the murderer is firing into a crowd. The ordinary shooting, however, where A shoots B, cannot very well be characterized as knowingly creating a risk of death to more than one person by hazardous means. If it were otherwise, virtually every shooting murder would *994 become a capital offense because, certainly, it is in almost any shooting case remotely possible that a projectile might exit the body of the victim and injure another person. The run-of-the-mill shooting is not, however, what this aggravator is all about. In the typical shooting, the shooter is not “knowingly” creating a risk of death for others and ordinarily has nothing in mind other than shooting his victim. That is the case here. Schoels was engaged in hand-to-hand combat with another youth who had threatened to go get a gun and shoot him. During their wrestling match Schoels shot twice into the body of the man with whom he was fighting. Two bullets entered the other youth’s body. One of the bullets penetrated the aorta, causing death. It cannot be honestly said that Schoels knowingly, or otherwise, created a risk of death to anyone other than the person whom he shot at short range.

 The majority exaggerates the “dangerousness” of this youth. Schoels’ assailant threatened to go get a gun and shoot him. The record tells me that Schoels drew his weapon only after his assailant tackled him and a fight ensued between Schoels and a man who had threatened his life. I think it is extremely unfair to try to characterize this young man as a blood-thirsty killer who is likely to go out and kill innocent people.

 I note that the Task Force does not claim that its statistics, per se, support the conclusion that the death sentence is applied in a discriminatory manner. The Task Force’s study does, however, lead one to the conclusion that standards must be imposed on presently unrestrained prosecutorial discretion. If standards were in place, it would be much easier to compare decision-making factors and to identify cases in which the only factor that could have led to the decision to seek the death penalty was the defendant’s race or other improper considerations. In other words, even if prosecutors are not, in fact, making decisions based upon improper racial considerations, the adoption of standards would, nevertheless, help to minimize the appearance of impropriety that naturally arises when those with unfettered discretion target for the harshest penalties — in a disproportionate manner — black defendants. It would also serve to temper any temptation to engage in improper racial discrimination in the future.